2025 IL App (2d) 240263-U
No. 2-24-0263
Order filed April 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-965 |
| | ) ) | Honorable |
| MARGARET A. WISNER, | ) ) | Michael E. Coppedge, Mark R. Gerhardt, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to support defendant's convictions of reckless conduct beyond a reasonable doubt; defendant forfeited her claim of sentencing error.

¶ 2    Following a bench trial before the circuit court of McHenry County, defendant, Margaret A. Wisner, was convicted of three counts of reckless conduct (720 ILCS 5/12-5(a)(2) (West 2020)) for which she received consecutive three-year terms of imprisonment. Defendant appeals, challenging the sufficiency of the evidence, and she argues that her sentences were excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On November 16, 2020, defendant and her husband took their son, the victim, S., to Mercyhealth Hospital and Medical Center in Wisconsin, where S. presented with extreme malnourishment.  Thereafter, on January 22, 2021, the State filed a 12-count information alleging three counts of aggravated battery (*id.* § 12-3.05(b)(1) (count I—failing to provide adequate nutrition, count II—failing to provide adequate medical care, count III—failing to provide both adequate nutrition and medical care)), three counts of aggravated domestic battery (*id.* § 12-3-3(a) (count IV—failing to provide adequate nutrition, count V—failing to provide adequate medical care, count VI—failing to provide both adequate nutrition and medical care)), three counts of reckless conduct (*id.* § 12-5(a)(2) (count VII—failing to provide adequate nourishment, count VII—failing to provide adequate medical care, count IX—failing to provide both adequate medical care and nutrition)), and three counts of endangering the life or health of a child (*id.* § 12C-5(a)(1) (count X—failing to provide adequate nourishment, count XI—failing to provide adequate medical care, count XII—failing to provide both adequate medical care and nutrition)).  The case proceeded to a bench trial beginning September 11, 2023.

¶ 5    S. was born in January 2014.  On January 17, 2017, S. visited Dr. Todd Giese for his three-year checkup.  Giese noted only that S. was experiencing a speech delay; he noted no other physical or neurological abnormalities.  Giese spoke with defendant about S.'s diet, encouraging that S. eat less processed food and snacks and to eat more fruit and vegetables.

¶ 6    Susan Perkins, the program manager of the Autism Resource Center for Options in Advocacy, testified that, in October 2018, she met with defendant and S.  Defendant raised concerns over S.'s eating habits and possible autism.  Defendant told Perkins that S. "did not eat very much and was a very picky eater."  Perkins observed that S. had trouble walking, and she encouraged defendant to follow up with other medical personnel about her concerns.  Perkins noted that, at the time she met with defendant, she was concerned that S. was not receiving any services

for his speech, eating, and walking issues. Perkins testified that defendant, for various reasons, canceled all the future appointments she made with the Autism Resource Center, with Perkins' final communication with defendant being a February 5, 2019, attempt to reschedule a home visit that went unanswered.

¶ 7     On November 13, 2018, Dr. Jamie Gancayo, a pediatrician in the same practice as Giese, examined S. Defendant sought the appointment because of specific concerns: S.'s behavior, his gait, his refusal to eat anything other than cheese crackers, and his intermittent constipation. Gancayo observed that S. was very pale, his knees were touching, and his toes were curled or clawed. Gancayo urged defendant to pursue testing to determine the causes of S.'s gait issues and paleness and to follow any recommended course of treatment. Gancayo suggested testing at the Special Needs Clinic at Children's Hospital in Wisconsin because the clinic could accomplish the needed orthopedic and neurological evaluations, imaging, blood work, and other testing in either a single or very few visits. Defendant wished to treat S. closer to home, and, on November 27, 2018, Gancayo referred S. to Dr. Albert Knuth, a pediatric orthopedist. Gancayo testified that, as far as she knew, defendant did not schedule an appointment for S. at the Special Needs Clinic, but she did take S. to an appointment with Knuth.

¶ 8     Knuth testified that, on December 11, 2018, he examined S. In presenting S.'s history, defendant told Knuth that S. had progressively worsening knock knees, and his diet was limited because S. "liked one type of cracker." Knuth's examination of S. was hampered because S. was uncooperative and screaming. Knuth sought to determine whether S.'s problems were due to neurological, metabolic, or nutritional issues; he therefore recommended that S. be examined by specialists. Knuth also asked defendant to keep him informed of the results of the evaluations he recommended. The defense questioned whether Knuth provided a written report to defendant about his examination and recommendations, and Knuth explained his standard office procedures,

but was unable to say for certain whether the procedures had been followed in this case. Knuth saw S. just that one time and did not receive any updates regarding his recommended evaluations of S.

¶ 9 Defendant's social media posts from January 2018 through S.'s November 2020 initial hospitalization consistently discuss his limited diet. For example, during that time, defendant repeatedly posted that S. would eat primarily cheese crackers and drink apple juice.[1] In addition to consistent acknowledgement of S. eating only cheese crackers, defendant consistently expressed concerns over his ill health. In January 2020, defendant posted that S. was "[g]oing to be 6 but he is still the size of probably a 3-4 year old. So tiny." She expressed concerns over S.'s complaints of pain in his hips and legs. In October 2020, defendant acknowledged the likely need to obtain medical care for S.'s ill health, consisting of bouts of constipation followed by vomiting and diarrhea. Defendant was also consistently aware of S.'s weight and small size. For example, on November 14, 2020, two days before S.'s initial hospitalization, defendant posted that S. weighed "just 31 pounds…. and he will be 7 soon. Not good."

¶ 10 On November 16, 2020, defendant took S. to the emergency room at Mercyhealth Hospital. Elsa Beganovic, R.N., testified that she was an emergency room nurse and cared for S. that day. Beganovic's visual inspection of S. led her to believe he was malnourished, and, from his size and appearance, Beganovic believed S. to be three or four years of age and was "shocked" when she learned S. was almost seven. S.'s lower legs were swollen, and he was pale and sickly. While taking S.'s history, defendant told Beganovic that S. had not been taken to any medical care during

---

[1] A representative post from January 2020 discussing S.: "Won't eat anything but his crackers, candies and juice." Similarly, a representative August 28, 2020, post related that S. "literally only eats crackers and drinks apple juice. And I mean only."

the preceding two years. Based on their interaction, Beganovic believed that defendant was "overwhelmed" and was "more worried about her own self, what was going on with her own self, and how she was feeling at that moment versus the child." Beganovic noted that defendant did not attempt to physically reassure S. during the examination.

¶ 11 Beganovic was concerned that S. was being abused based on his appearance, low weight, results of testing showing that he was malnourished, and the inconsistencies between S.'s clinical presentation and defendant's narrative history about S. When defendant and S.'s father were informed that S. needed to be admitted to the hospital, they "wanted to leave." Beganovic called Child Protective Services due to her concerns that defendant and S.'s father would leave with S.; however, they relented and agreed to S.'s hospitalization when Beganovic and the medical team told them, "if they leave, that we would have to call the authorities at that time."

¶ 12 Dr. Hamik Eiramian, an emergency room physician, testified that, on November 16, 2020, he treated S. when his parents brought him to the hospital. Eiramian recalled that defendant was concerned over S.'s issues with constipation and urination, and one of her chief complaints was that S. was not urinating as usual for the preceding two to three days. Eiramian testified that his examination of S. showed "very abnormal" amounts of swelling in his legs, along with paleness, cracked skin, dry mouth, rapid heart rate, and low levels of hemoglobin, albumin, and protein. S. was very thin with no body fat. Eiramian convinced defendant to allow S. to be admitted to the hospital for treatment, remarking that he "did not feel safe with [S.] going home that day." Moreover, Eiramian convinced defendant to transfer S. to another facility that could better treat his condition. He stated that the testing showed that S. was dehydrated, anemic, had critically low levels of albumin, all of which led him to opine that, on November 16, 2020, S. was malnourished and failing to thrive.

¶ 13    Carmen Sacco, currently serving as a deputy chief of police of the City of Harvard police department, testified that, on November 17, 2020, he was a detective with the Harvard police and was assisting the Department of Children and Family Services (Department) with a welfare check on the other children at S.'s home. While there, he spoke with defendant, who told him that S. had autism and would eat only cheese crackers and drink only apple juice, and he rejected nutritional supplements, like PediaSure. S. also had issues defecating but had regularly seen doctors and was otherwise healthy. Defendant explained to Sacco that she had not taken S. to receive medical attention any earlier because of the COVID-19 pandemic. Sacco also explained that he compared defendant's statement to him with information in S.'s medical records and found inconsistencies, such as when S. had last seen a doctor. Additionally, Sacco conducted an open-source review of defendant's Facebook posts and observed a photograph of defendant attending a political rally in October 2020 while not wearing a mask, which was inconsistent with her reasoning for not seeking medical attention for S.

¶ 14    Rebecca Kuester, a social worker at Children's Hospital in Milwaukee, testified that, on November 17, 2020, she was contacted about defendant trying to remove S. from the hospital against medical advice. Kuester tried to allay defendant's concerns about S.'s treatment. According to Kuester, the hospital was concerned with S.'s malnourishment and whether adequate nutrition could be provided outside of a hospital setting. By contrast, defendant wished S. to receive oral feedings instead of using a nasogastric feeding tube to provide adequate nutrition, and she believed that S.'s blood work could be monitored at home instead of in the hospital. According to Kuester, defendant told her that S. had been eating normally—pizza, French fries, and chicken nuggets—but beginning in September 2020, S. began "primarily eating Cheez-Its." Additionally, defendant told her that S. had less energy leading up to bringing him to the hospital, and that, since October 2020, S. had not been standing, "preferring to lay around." Kuester related that,

eventually, defendant relented and allowed S. to remain in the hospital with her husband while she went home.

¶ 15    Phylicia Ranes, an investigator with the Department, testified that, on November 19, 2020, she assisted in taking S. into protective custody and personally observed S.'s visible underdevelopment for his age and his readily apparent physical health issues.  Defendant also spoke to Ranes, admitting that she and her husband "maybe didn't make the best choices" for S.'s health.  Defendant also claimed that S.'s condition had deteriorated over "a couple of weeks of [S.] not really doing the greatest," before she made the decision to seek medical help for S.  Ranes photographed S. to document his condition and noted that he required assistance to move into the requested poses.  Her photographs showed his physical state, including many conditions consistent with severe malnutrition, such as a distended belly, dry and flaking skin, and hair loss.  Ranes stated that she would not allow defendant to take S. from the hospital because she feared he would not survive.

¶ 16    Rabiya Wasi, currently a child welfare specialist with the Department testified that, on November 17, 2020, she investigated S.'s home, and the home was clean and "pristine."  In addition, there appeared to be abundant food in the cabinets and the refrigerator.  On December 3, 2020, Wasi met S. in the hospital.  S. was weak, frail, laying down, and unable to stand on his own.  He had sores on his arms and back, his hair was thinning and, in places, missing, his ribs and the bones in his spine and shoulder blades were prominently visible, and maneuvering him to take the photographs visibly caused S. pain.  Wasi further stated that the appearance of S.'s legs was "really alarming."

¶ 17    In December 2020, defendant's husband contacted Gancayo asking to change parts of S.'s medical record.  Specifically, a November 13, 2018, record of an evaluative appointment with Gancayo included in the medical history that S. "[e]ats only cheese crackers."  On December 8,

2020, after S. had been hospitalized with malnourishment, defendant's husband asked to change the medical record from " 'Eats only cheese crackers' " to " 'Eats *mostly* cheese crackers.' " (Emphasis added.) On January 7, 2021, Gancayo advised her office that she refused to change the November 13, 2018, record because she believed it "would be me lying and saying something other [than] what I learned/documented at the time." On January 12, 2021, defendant and her husband sent a letter to the practice disputing the November 13, 2018, record as inaccurate about S.'s eating habits, claiming that S. "ate mostly cheese crackers, but he also ate bites of other foods and has always and consistently [eaten] peanut butter candies."

¶ 18    Defendant and her husband exchanged messages on Facebook following S.'s admission to the hospital. On November 17, 2020, defendant shared with her husband that a social worker at the hospital told her that they needed to bring up S.'s electrolytes. Defendant's husband replied that, according to his reading about electrolytes, medical care was necessary until the electrolyte levels returned to normal otherwise S. "could have a multitude of problems that may require emergency medical care." Also on November 17, 2020, defendant's husband told defendant that the Department had arrived at their home regarding S. Defendant responded to this by writing, "I'm so pissed," and "I told you."

¶ 19    On November 19, 2020, defendant used Facebook to message her husband that she planned "taking charge" of S.'s treatment because she believed that the plan to use PediaSure as a caloric supplement for S. was unreasonable. She wrote that the hospital team's "unrealistic plan with no calories from crackers means [S.] will never come home."

¶ 20    Dr. Charles Morrow, medical director of Almost Home Kids and qualified as an expert in pediatrics, testified about S.'s care while at Almost Home. Almost Home is a transitional care facility for children who do not require hospitalization, but who cannot be cared for at home. In December 2020, S. entered Almost Home with "just about every diagnosis you could have from

malnutrition." At that time, S. had scabbed skin, brittle hair, decaying teeth, no toilet training, and he was unable to brush his own teeth. Based on his review of records and his involvement with S.'s medical care, Morrow opined that, leading up to his care at Almost Home, S. had been "profoundly neglected and essentially starved."

¶ 21 Morrow noted that, when S. first came to Almost Home, he weighed about 29 pounds, which was significantly below the first percentile for children his age. However, in October 2021, after receiving care, he weighed about 47 or 48 pounds, placing him around the 15th or 20th percentile on the growth chart. The improvement after receiving care and nutrition, along with extensive testing that revealed no genetic or organic explanations, led Morrow to infer that the causes of his previous condition were due to environmental issues.

¶ 22 In April 2021, S. fractured his leg while standing up from a chair. Morrow opined that the fracture was caused by severe osteopenia because S. "had very brittle bones, and they cracked." According to Morrow, it would have taken years for S. to reach that degree of bone-density loss.

¶ 23 Morrow observed that S. was treated and remained at Almost Home for a long time. There was no medical necessity driving his placement there, but he had been placed there at the Department's behest. Morrow also noted that, when S. was about 6½ years old, he weighed about 60 pounds. Further, Morrow opined that S. was not autistic.

¶ 24 On cross-examination, Morrow testified that, as of his last visit with S., he was aware that S. had been diagnosed with Crohn's disease, and that he had tested positive numerous times for *Clostridioides difficile* (*C. diff*) numerous times. In August 2021, S. developed a feeding intolerance, and twice before then in 2021, he had to be hospitalized when he required a level of care that Almost Home could not provide. Likewise, on redirect testimony, Morrow testified that S. continued to experience gastrointestinal issues and flare-ups, abdominal distention, and feeding intolerances.

¶ 25    Dr. Michelle Iyamah, a clinical psychologist and qualified as an expert in clinical psychology, testified that, in April and May 2021, she assessed S. for Autism Spectrum Disorder, Generalized Anxiety Disorder, sensory issues, and developmental delays.  Her assessment of S. produced a score of 53 on the Gilliam autism rating scale, and Iyamah noted that a score of 54 or greater was necessary to begin concern for autism; Iyamah opined that S. did not have autism.  She stated that S. looked younger than his age and was tiny.  At the time of the assessment, S.'s core muscles were so weak that he had difficulty sitting upright.  Iyamah opined that S.'s deficits were likely due to the lack of formal schooling rather than a disorder.

¶ 26    Several of S.'s physicians testified the changes in S.'s medical condition following his initial treatment in November 2020 and early in 2021.  Dr. Peter Osgood, an expert in pediatric gastroenterology and gastrointestinal motility disorders, testified that, in June 2021, he became involved in S.'s treatment.  Osgood noted that, in 2021, S. began hitting roadblocks in his growth and ability to take in nutrition.  He determined that there was no evidence to support that S. had any disorders, like Crohn's disease, colitis, celiac disease, or any others, before the 2021 difficulties.

¶ 27    Morrow testified that, after S. had come into Almost Home's care, he gained weight well and reached age-appropriate results for size and weight; he attributed this success to S. receiving adequate nutrition, and S. had become "a very good eater" while in the care of Almost Home.

¶ 28    Osgood testified that, in August 2021, S. could no longer tolerate increasing his caloric and nutritional intake, and S. received an ileostomy.  S. improved with this procedure and began receiving feedings both orally and through an emplaced tube.  Osgood opined that S.'s malnutrition caused his gastrointestinal issues, not the other way around.  Further, Osgood noted that, upon receiving more and proper nutrition, S.'s growth, willingness to speak with others, and gastrointestinal issues all improved.  In February 2022, the ileostomy was reversed.  Between April

and June 2023, S. was diagnosed with Crohn's disease, but, before that time, there were no definitive symptoms of Crohn's. Osgood noted that, nevertheless, when the gut is inflamed, one can lose calories and nutrition, which may lead to weight loss and changes in a person's metrics, like the body mass index. Osgood noted on cross-examination, that patients on the autism spectrum can be picky eaters. However, he had treated many children on the autism spectrum, and he had never "seen a child in that severe [of a] state."

¶ 29    Morrow opined that S.'s condition in November 2020 could have been prevented had S. received proper nutrition and adequate healthcare. Moreover, Morrow opined that S. was not autistic and noted that none of around 50 providers who worked with S. in the Lurie Hospital system, including a behavioral developmental pediatrician, found that S. had a behavioral disorder. Morrow further opined that S.'s significant developmental delay was attributable to "profound neglect," and noted that S. had received significant amounts of treatment, including eyeglasses for "severe visual impairment," dental care because his teeth were "rotten" when he was taken into care, along with extensive physical, occupational, nutritional, speech, and child life therapies.

¶ 30    Dr. Sandeep Narang, an expert in pediatrics and pediatric child abuse, testified that, when S. was initially brought to the hospital, he was severely malnourished, dehydrated, anemic, and had low protein levels and vitamin deficiencies. S. was diagnosed with severe malnutrition, scurvy, and osteopenia. S.'s weight upon admission was 32 pounds, and by early December 2020, his weight had declined to 28 or 29 pounds. S.'s weight for his age in the U.S. was in the 0.1 percentile, and Narang opined that S. had failure to thrive syndrome. The medical team was concerned about refeeding syndrome, which, when nutrition is reintroduced into a severely malnourished individual, can cause seizures or cardiac arrhythmias leading to the individual's death. Narang opined that S.'s vitamin D deficiency caused "severe demineralization" of his bones and this condition helped to explain S.'s statement to the medical team "that he felt like his bones

were going to crack." Narang opined that it would take "months at least" for S. to develop the conditions he presented upon admission to the hospital. Narang also noted defendant's resistance to placement of a feeding tube for S. and other recommended therapies. Narang also opined that S.'s condition of severe malnutrition was environmentally induced, and had S. not received medical intervention when he did in November 2020, he was at significant risk of complications of severe malnutrition, including seizures, electrolyte deficiencies, cardiac arrhythmias, and death. Moreover, Narang opined that S.'s malnutrition stunted his growth, impacted his vital organs and body systems, and imposed lasting effects on S.'s motor skills, speech, cognition, and psychology—particularly his relationship with food.

¶ 31    On February 28, 2022, defendant created a GoFundMe campaign seeking $10,000. In the page, S. is described as having gone through "some gastrointestinal issues" and "lost quite a few pounds" during the month before defendant brought him to the emergency room—both of which she attributed to a "colitis flare-up." Defendant complained about S.'s care and asserted that S. was a joyful and energetic child before the Department became involved with their family. Defendant further asserted that S.'s issues had been worsened "through the system's abuse of our child" which has "isolated, confused, and traumatized him, ripping him away from all he knows and loves while using his disability to their twisted and sick advantage."

¶ 32    Following the presentation of the foregoing medical evidence, the State rested. Defendant then proceeded with her case-in-chief.

¶ 33    Dr. Vincent Biank, director of pediatric gastroenterology, hepatology, and nutrition for the NorthShore University Health system, testified as an expert in pediatric gastroenterology on behalf of defendant. Biank opined that S. was a "fairly medically complex patient" with "an underlying behavioral feeding disorder" and "multiple complex medical issues that continue to require a team of providers in order to keep him healthy." Biank reasoned that, because, in June 2023, S.

continued to have a gastrostomy tube and received most of his nutrition from that source, he possessed a behavioral feeding disorder, and such a disorder could take years to finally resolve.

¶ 34  Biank explained that, because S. had a behavioral feeding disorder, defendant would have had difficulty feeding him, leading to a worsening of S.'s nutritional status.  Looking at S.'s growth charts, Biank believed that S.'s behavioral feeding disorder began to develop around 9 or 10 months of age.  When, in November 2020, S. began receiving nutrition through his gastrostomy tube, Biank noted a marked improvement in S.'s growth.

¶ 35  Biank based his opinion that S. was medically complex on factors such as his June 2023 diagnosis for Crohn's disease, his many *C. diff* infections, and the need for an ileostomy.  In addition, Biank believed that, based on the results of the testing in November and December 2020, S. had ongoing and active inflammation in his gastrointestinal tract, which supported his opinion of medical complexity.  In addition, S. was given gastrointestinal motility testing, and this sort of testing was commonly associated with medically complex patients.  Further adding to the complexity was the effect of S.'s behavioral feeding disorder, which made the provision of sufficient and proper nutrition difficult, and this cascaded into malnutrition and ultimately hospitalization.  Biank opined, however, that malnutrition was neither associated with the development of Crohn's disease nor any sort of gastrointestinal motility disorder, and thus, the continuing issues S. experiences are unrelated to his original presentation with malnourishment. Biank noted that, in June 2023, S. was refusing to eat, which Biank believed to demonstrate that S. was now so dysregulated that it was impossible to get him to eat by mouth.

¶ 36  On cross-examination, Biank agreed that, in 2018, two physicians had recommended to defendant that she investigate S.'s underlying health condition at that time.  Moreover, defendant and her husband were both responsible for providing S. with nutrition and medical care.  Biank

acknowledged that the feeding tube placed in November 2020 was a life-saving measure. Biank also agreed that environmental neglect could cause behavioral feeding disorder.

¶ 37    Defendant's son, C., also testified on her behalf. C. is S.'s older brother and was 16 years old when he testified. C. stated that S. enjoyed food from McDonald's, but he did not like to sit at the table while the rest of his family ate. There was plenty of food in the family's refrigerator and pantry, but S. was unreceptive to defendant's efforts to entice him to eat and would often not listen and walk away. During most of 2020, S. stopped eating some of the things he enjoyed, like chicken nuggets, fries, and pizza, but he would still accept cheese crackers. When S. stopped eating most types of food, neither defendant nor his father took S. to the doctor or hospital, until November 2020.

¶ 38    The trial court found defendant guilty of three counts of reckless conduct (counts VII-IX) and acquitted her on the remaining counts (counts I-VI and X-XII). The court provided an overview of the elements on the charges of which defendant was convicted: it noted the three counts alleged that defendant had recklessly caused great bodily harm to S. by failing to provide adequate nutrition (count VII), by failing to provide adequate medical care (count VIII), and by failing to provide adequate medical care and adequate nutrition (count IX). The element of great bodily harm had been proved beyond a reasonable doubt based on the "volume and depth of medical evidence." The court noted that "a person acts recklessly when she consciously disregards a substantial risk that a result will occur." Applying this definition to the failure to provide adequate nutrition, the court found that S. had been subsisting on cheese crackers for almost two years, was visibly deteriorating and becoming sicker, and was losing weight to the point that he weighed about 30 pounds when hospitalized despite being six years old. The court reasoned that a "parent knows that children can go through unpredictable, unusual, and sometimes bizarre behavior. When, however, that type of behavior extends for prolonged periods and results in

visibly observable, adverse consequences, that is a conscious disregard of a substantial risk that a result will occur." Regarding the failure to provide adequate medical care, the court relied on the volume of evidence demonstrating that defendant disregarded medical advice and did not follow up with reasonably recommended medical care for S. For the same reasons, the court found that the State had also proved count IX (the failure to provide both adequate nutrition and adequate medical care).

¶ 39 After the trial concluded, but before the sentencing hearing was held, the trial court, Judge Coppedge, unexpectedly passed away. Judge Gerhardt replaced Judge Coppedge for the sentencing hearing.

¶ 40 At the sentencing hearing, the trial court listened to the testimony presented there, read the trial transcripts, the exhibits, the sentencing exhibits, the presentence investigation, and the arguments of the parties. The court expressly noted that it considered all factors in aggravation and mitigation, but it would only provide specific comments on a few of them. Regarding mitigation, the court rejected defendant's argument that S.'s decline was gradual or not noticeable because it was contrary to the evidence. The court found defendant's health, namely her cancer diagnosis, the hardship her incarceration would cause to her children, the expense to the State due to her incarceration, and defendant's lack of criminal history as mitigating factors. The court did not find that defendant's arguments that S.'s health had improved, and that incarceration would harm defendant's health to be very compelling as mitigating factors. The court also declined to give much weight to the factors that the crime would be unlikely to recur, and defendant was likely to comply with a period of probation, because the court believed the evidence to show that defendant "buries her head in the sand when it comes to the results of her action[s]." The court was also concerned with defendant's refusal to accept the consequences of her decisions or to take responsibility with how the case arose in fashioning its sentence. Based on the foregoing, the court

sentenced defendant to three concurrent three-year sentences on counts VII-IX. Defendant timely appeals.

¶ 41                                                II. ANALYSIS

¶ 42     On appeal, defendant argues that State failed to prove defendant guilty beyond a reasonable doubt of the offenses of reckless conduct; specifically, that the State did not adequately show that she consciously disregarded how her actions might affect S.'s nutritional status or that she failed to provide adequate nutrition or medical care under the circumstances of this case. Defendant also argues that her sentences were excessive, contending that the trial court improperly weighted and misapplied applicable factors in aggravation and mitigation.

¶ 43                                      A. Sufficiency of the Evidence

¶ 44     Defendant challenges the sufficiency of the evidence to support her convictions of reckless conduct. When faced with a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. The reviewing court does not retry the defendant by reweighing the evidence or substituting its judgment for that of the fact finder's. *Id.* Rather, all reasonable inferences from the evidence must be drawn in the prosecution's favor, and the conviction will not be disturbed unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 45     Defendant was convicted of three counts of reckless conduct. "A person commits reckless conduct when he or she, by any means lawful or unlawful, recklessly performs an act or acts that: *** cause great bodily harm or permanent disability or disfigurement to another person." 720 ILCS 5/12-5(a)(2) (West 2020). Thus, the State needed to prove beyond a reasonable doubt that

defendant (1) recklessly (2) performed acts that (3) caused great bodily harm to S. We hold that the evidence is sufficient to find each of these elements beyond a reasonable doubt.

¶ 46 A person is reckless or acts recklessly when she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." *Id.* § 4-6. Here, a reasonable trier of fact could have determined that the evidence proved beyond a reasonable doubt that defendant was reckless because she consciously disregarded the substantial risk that S. would become life-threateningly malnourished from subsisting on a virtually all-cracker diet.

¶ 47 The record shows that, in January 2017, S. was physically normal. In November 2018, S. was diagnosed with knock knees, and defendant was urged to allow medical testing to determine the cause. Defendant did not follow through with the medical testing. Defendant, in repeated and consistent social media posts from 2018 to 2020, recognized both that S.'s diet was limited to mostly cheese crackers, and that he was beginning to exhibit stomach and digestive-tract issues, along with an alarming failure to grow and even weight loss. In November 2020, when S. was finally taken to the emergency room, he exhibited classic symptoms of significant malnourishment and starvation. He was so severely underweight that he was well under the first percentile for child of his age, and defendant herself wrote that he weighed "just 31 pounds…. and he will be 7 soon. Not good." We conclude, therefore, that the medical testimony and exhibits overwhelmingly support the proposition that defendant consciously disregarded the substantial and clear risk that S. was literally starving when, for about two years, she fed him little other than cheese crackers.

¶ 48 Additionally, the record is replete with opinion testimony that timely medical intervention would have prevented S.'s descent into starvation and its consequent and lasting physical effects. Defendant ceased seeking medical help for S. after being urged by Gancayo and Knuth to

investigate the cause of his knock knees. Defendant continued to remark in her social media posts between 2018 and 2020 about S.'s diet and his pain, ill health, and alarmingly small size, yet she did not seek medical assistance. Instead, defendant expressed concern in that latter part of 2020 that, due to S.'s obvious physical condition, he would need to go to the doctor, and this gives rise to a clear and reasonable inference that defendant was concerned that, when doctors discovered the severity of his medical condition, they would inform the authorities, and S. would be taken from her. Indeed, once the Department became involved and began investigating, defendant represented to investigators and medical personnel that the onset of S.'s condition began a couple months before and that she had been giving him appropriate medical care. The testimony about the investigation and the emergency room visit overwhelmingly supports the proposition that defendant consciously disregarded the risk of failing to provide medical care when S. began to visibly and obviously exhibit symptoms of malnourishment and starvation arising from his two-year diet of little other than crackers. Accordingly, based on the abundant evidence in the record, we conclude that a reasonable trier of fact could have found the element of recklessness beyond a reasonable doubt.

¶ 49    Defendant characterizes the evidence as showing only a medically complex child who was admittedly a picky eater, whose weight plateaued, and whose behavioral issues frustrated all attempts to provide adequate nourishment. While such a view of the evidence may not be inconsistent with the record, it is certainly inconsistent with our standard of review. When considering a sufficiency-of-the-evidence challenge, we draw all reasonable inferences in favor of the prosecution, and we cannot reweigh the evidence or substitute our judgment for that of the fact finder, especially regarding issues of credibility. *Jones*, 2023 IL 127810, ¶ 28. Defendant's interpretation does just this—slanting the evidence in her favor, not mentioning the fact finder's determinations or how (or if) they were unsupported by the evidence, and asking us, using her

rubric, to replace the fact finder's judgment with our own. For this reason, we reject defendant's contention.

¶ 50    In conjunction with her plea to substitute our judgment, defendant attempts to justify her disregard of the obvious, albeit gradual, signs that S. was growing malnourished and was, in fact, starving, arguing he was a picky eater with behavioral issues. This is the same argument as in the preceding paragraph, but it assumes that the child possessed the agency and responsibility of providing a nutritious diet instead of the parent. As it is effectively a different side of the coin of the preceding paragraph's argument, we need not address it further and, in any event, we refuse to countenance defendant's victim blaming, especially where the record overwhelmingly demonstrates defendant's awareness of her actions, as evidenced by her social media posts, as well as the victim's increasing ill health during the relevant time frame.

¶ 51    Regarding the element of recklessness specifically, defendant contends that the State was required to prove "that there existed *no way* for [defendant] to reasonably not have seen that her child's health was in danger as a result of *her* care for [S.]" (Emphasis in original.) Recklessness is the conscious disregard of a substantial and unjustifiable risk that a result will follow. 720 ILCS 5/4-6 (West 2020). Even if we accept, for the sake of argument, that defendant's formulation is correct, we cannot say that there was any reasonable way that defendant could not have seen that allowing a young child to subsist on a diet of crackers—effectively a bread-and-water diet—for two years did not present a substantial risk of malnourishment or even death. For at least two years, S. appears to have eaten little other than crackers. In the latter part of 2018, neither Gancayo nor Knuth noticed anything abnormal about S.'s size and weight, although S. had developed knock knees. However, S. (in defendant's words) plateaued in his weight and even, as November 2020 neared, began to lose weight he could ill afford to lose. Defendant clearly recognized the gravity of the situation when, in January 2020, she posted to a friend that, while S. was nearly six, he

remained the size of a three- or four-year-old child. Finally, there was no reasonable way for defendant to avoid noticing the outward signs of severe malnourishment—the dry, flaky skin, the brittle and thinning hair, the swollen and distended belly, and the emaciation. Even when defendant recognized that a 31-pound weight for a nearly seven-year-old child was "[n]ot good," she persisted in her inaction for two more days before finally relenting and bringing S. to the emergency room for help. We can conceive of no reasonable way, other than conscious disregard of the evidence of her own senses, that a parent does not see the connection between allowing her child to subsist on a two-year-long bread-and-water diet and his decreasing weight, faltering wellbeing, and visibly increasing signs of malnourishment. We flatly reject defendant's contention.

¶ 52 Defendant argues that the trial court's rationale in explaining why the evidence was insufficient to convict her of aggravated battery, aggravated domestic battery, and child endangerment applies with equal force to the reckless conduct charges, and such application should have resulted in acquittals all around. We disagree. Initially, we note:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.

(b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct.

> Conduct performed knowingly or with knowledge is performed wilfully [*sic*], within the meaning of a statute using the term "willfully", unless the statute clearly requires another meaning." 720 ILCS 5/4-5 (West 2020).

"Knowledge," therefore, requires a defendant to possess a conscious awareness that a particular result is practically certain to occur because of her conduct. *Id.* This is in contrast with "recklessness," which requires a defendant to consciously disregard the substantial risk that a result will occur because of her conduct. *Id.* § 4-6.

¶ 53 Defendant argues that the trial court based its acquittals on the inconsistencies between her behavior and the allegations in counts I-VI and X-XII. Specifically, those counts all required that the State prove that defendant knowingly caused great bodily harm to S. The State was therefore obligated to prove that defendant acted knowingly—to show that she was consciously aware that it was practically certain that S. would experience great bodily harm through her failures to provide nourishment, medical care, or both. The court reasoned that, because defendant provided crackers and minimal nourishment to S. under the belief that he was a picky eater, she was not trying to bring about his starvation—in other words, defendant did not try to deprive S. of food. This is still consistent, however, with reckless conduct, because that involves the conscious disregard that placing a young child on what amounts to a bread-and-water diet for two years will likely result in the child's malnourishment and starvation. Likewise, the court determined that, when defendant did not dispose of the crackers (essentially, the evidence of an intentional bread-and-water diet), this conduct was inconsistent with any inference that she was depriving S. of food and was trying to cause his malnourishment and starvation. Because defendant had ample time to dispose of the cache of cheese crackers before taking S. to the emergency room but did not, the court reasonably inferred that she was not depriving S. of food but believed that S. was simply a picky eater who would only eat the crackers. Thus, because she was not trying to bring about malnourishment and

starvation, she was not acting knowingly. However, even if defendant was not trying to starve and malnourish S., feeding him a bread-and-water diet for two years evidences a conscious disregard of the obvious risk that such a limited and long-term diet for a young child will result in malnourishment and starvation. Accordingly, we reject defendant's contention and hold that a rational trier of fact could find that the evidence established beyond a reasonable doubt that defendant acted recklessly.

¶ 54    The next element of the offense of reckless conduct is performing the alleged acts. The State alleged that defendant failed to provide adequate nourishment and failed to provide adequate medical care. The record shows that, in January 2017, S. was medically evaluated at his three-year doctor's appointment, and no abnormalities other than a speech delay were noted. Late in 2018, S. developed knock knees, and, by November 2020, S. was severely malnourished and exhibited many visible symptoms of starvation. Throughout that time, defendant repeatedly commented that S. ate only crackers. While defendant may have tried to entice S. to eat other foods, the evidence overwhelmingly supports the conclusion that defendant failed to provide adequate nutrition, as evidenced by S.'s physical decline into starvation over the three-year period. We hold that a rational trier of fact could find beyond a reasonable doubt that defendant failed to provide adequate nourishment to S.

¶ 55    Similarly, from the end of 2018 until November 2020, S. was not taken to any doctors. During this time, S. was becoming emaciated, unable to move around on his own, and exhibited visible signs and symptoms of starvation. It was only when S. appeared to be *in extremis* that defendant finally brought him to receive medical care. The record thus overwhelmingly supports the conclusion that defendant failed to provide adequate medical care during S.'s visible decline into starvation. We hold that a rational trier of fact could find beyond a reasonable doubt that defendant did not provide adequate medical care for S.

¶ 56    Defendant argues that defendant's home was stocked with abundant and varied healthy foods, and that S. was simply a picky eater. While true, the argument begs the question—did defendant provide *adequate* nourishment to S. The record resoundingly demonstrates that S. subsisted on crackers for two or more years, and, when medical intervention was achieved, S. was the size and weight of a three- or four-year-old child. Moreover, S. exhibited visible signs and symptoms of starvation and required careful medical intervention to provide him with the calories and nutrition necessary to recover and eventually thrive. We reject defendant's argument.

¶ 57    Defendant also argues that the evidence is insufficient to demonstrate that she failed to provide S. with adequate medical care. Defendant contends that S. was a medically complex child, and even physicians and specialists were unable to discover the causes of his various conditions, such as Crohn's disease and *C. diff* infections. This subtly misstates the evidence and begs the question. The onset of Crohn's disease occurred well after S. had been hospitalized and removed from defendant's custody; likewise, the *C. diff* infections occurred during S.'s recuperation. Defendant ignores the fact that, from the beginning of 2019 until November 2020, the record does not show that S. received any outside medical care, and defendant did not follow up on any recommended treatments, even though in November and December 2018, she had sought out medical care for S.'s knock knees. The record also contains evidence that, had S. received medical care and intervention much closer to the beginning of his bread-and-water diet, his condition would not have progressed and his road to recovery would have been significantly shortened. Thus, a reasonable fact finder could have determined beyond a reasonable doubt that defendant did not provide S. with adequate medical care.

¶ 58    Defendant maintains that she provided medical care to S. However, the issue is not whether she took S. to see a doctor a couple of times in 2018 and early in 2019, and again in November 2020; the issue is whether she provided *adequate* medical care. Defendant was aware that S. was

significantly small and underweight for his age, and yet she sought no medical intervention. Defendant knew that S. was losing weight and exhibiting visible signs of decline and starvation on his diet of crackers, and yet she sought no medical intervention. The evidence in the record establishes that earlier medical intervention would have likely prevented S.'s severe malnourishment and starvation, and yet defendant did not provide that medical care to S. We reject defendant's contention.

¶ 59    The final element of the offense of reckless conduct is causing great bodily harm to S. Defendant does not dispute the sufficiency of the evidence of this element on appeal. It is therefore forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited"). Regardless, there is ample evidence that S. experienced great bodily harm, from his visible symptoms of starvation to the aftereffects of that starvation on his future progress, such as requiring the placement of feeding tubes, an ileostomy to support his gastrointestinal tract, and the severe demineralization of his bones leading to a leg fracture when he stood. The record showed, through Narang's testimony, that S.'s growth was stunted, his vital organs and bodily systems were impacted to the point that S. was no longer urinating when defendant finally sought medical care for him, and S. faced long-term effects on his motor skills, speech, cognition, and his psychological relation with food. The record further bore out Narang's fears, as S. continued to make progress slowly while facing frequent roadblocks and setbacks. We conclude that, forfeiture aside, a reasonable trier of fact could have found the element of great bodily harm beyond a reasonable doubt.

¶ 60    For the foregoing reasons, we conclude that the evidence adduced at trial was sufficient to support defendant's convictions of reckless conduct beyond a reasonable doubt. Accordingly, we affirm the trial court's judgment.

¶ 61                                    B. Excessive Sentence

¶ 62   Defendant argues that the trial court did not properly weigh the factors in aggravation and mitigation leading to an improper and excessive sentence.  A reviewing court may not alter a trial court's sentencing decision absent an abuse of discretion.  *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).  In this context, a sentence will be deemed an abuse of discretion where the sentence varies from the spirit and purpose of the law or is disproportionate to the nature of the offense.  *Id.*

¶ 63   Defendant contends that her three-year sentence is wholly retributive and fails to account for significant mitigating factors, leading to an excessive sentence.  The issue raised by defendant is forfeited.  It is well settled that, to preserve a claim of sentencing error for review, a defendant must contemporaneously object and file a written postsentencing motion raising the issue.  *People v. Hillier*, 237 Ill. 2d 539, 544 (2010).  Defendant has done neither; therefore, defendant's sentencing claim is forfeited.

¶ 64   Additionally, defendant does not seek review under the principles of plain error.  Where a defendant has forfeited a sentencing issue, she may seek review of the issue under the doctrine of plain error; where the defendant does not request plain-error review, it, too, is forfeited.  *Id.* at 545-46.  Thus, defendant has forfeited our review of her claim of sentencing error.

¶ 65   Additionally, we are unable to consider defendant's claim of sentencing error because she did not include a complete record for us to review her contentions.  Defendant, as appellant, has the obligation to provide a sufficiently complete record of the proceedings to support a claim of error on appeal.  *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984).  The reviewing court will presume that the trial court entered an order that possessed a sufficient factual basis and conformed with the law; any doubts arising from the incompleteness of the record will be resolved against the appellant.  *Id.* at 392.  Moreover, where the claim of error relates to the conduct of a hearing, the claim is not subject to review without the inclusion in the record on appeal of a report or record of the hearing.  *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001).

¶ 66 Here, defendant initially submitted the reports of proceedings covering only the trial. Later, defendant filed a supplement to the record that included only the continued sentencing hearing, in which defendant made a statement in allocution and the trial court pronounced sentence. Defendant did not include, either in her initial supplement to the record or in any additional supplemental record, the report of proceedings (or a substitute (see Ill. S. Ct. R. 323 (eff. July 1, 2017) (describing alternatives to providing a verbatim transcript, where necessary)) covering the first portion of the sentencing hearing in which evidence in aggravation and mitigation was presented and the parties provided argument to the court.

¶ 67 The issues impeding our review notwithstanding, defendant's claim of sentencing error lacks merit. Defendant speculates that only two factors in aggravation should apply in her case, as opposed to "numerous" factors in mitigation. Defendant proceeds stepwise through the factors in mitigation that she believes to apply, requesting this court to apply her analysis and to reweigh the factors and substitute our judgment for that of the trial court. This we may not do, particularly where we lack any record of the hearing that provided the basis for the court's exercise of discretion. See *Alexander*, 239 Ill. 2d at 213 (the trial court has a better opportunity to consider the sentencing factors because it observed the defendant and the proceedings; therefore, the reviewing court must not substitute its judgment for that of the trial court simply because it may have weighed the sentencing factors differently).

¶ 68 Thus, because defendant effectively asks that we reweigh the sentencing factors while failing to provide the tools to us to review the trial court's exercise of discretion, we reject her claim of sentencing error. Accordingly, we affirm the trial court's judgment in passing sentence.

¶ 69                                   III. CONCLUSION

¶ 70 For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 71 Affirmed.